Estate of Frank A. Moorshead, Deceased, Hannah W. Moorshead and Frank A. Moorshead, Jr., Executors, and Hannah W. Moorshead, Individually v. Commissioner.
Estate of Moorshead v. Commissioner
Docket No. 48008.
United States Tax Court
T.C. Memo 1955-215; 1955 Tax Ct. Memo LEXIS 120; 14 T.C.M. (CCH) 848; T.C.M. (RIA) 55215; July 29, 1955
William H. Doerr, Jr., Esq., for the petitioners. William G. Handfield, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined a deficiency of $11,043.16 in the income tax of Frank A. Moorshead, deceased, and Hannah W. Moorshead for 1948. The only issue presented is the correctness of respondent's action in disallowing a deduction of $27,851.59 taken as a business bad debt on account of sums advanced to a client or paid for his account in 1939 and all of which remained unpaid at the time of the client's death in 1948. The correctness of the respondent's action in disallowing other items has been conceded by petitioners. Findings of Fact Some of the facts have been stipulated and are found accordingly. Frank A. Moorshead, sometimes *121 hereinafter referred to as the decedent, died on April 15, 1954. The petitioners, Hannah W. Moorshead and Frank A. Moorshead, Jr., are the duly qualified and acting executors of the decedent's estate. For 1948 the decedent and Hannah W. Moorshead, his wife, filed a joint income tax return. From 1907 until the time of his death the decedent was an attorney-at-law and during that period maintained an office for the general practice of law in Philadelphia, County of Philadelphia, Pennsylvania. He also maintained a separate office in Lansdowne, Delaware County, Pennsylvania. Decedent was licensed to practice law before the Supreme and Superior Courts of Pennsylvania, all courts of Philadelphia and Delaware Counties, Pennsylvania, the United States Court of Appeals for the Third Circuit and the District Court of the United States for the Eastern District of Pennsylvania. During the last 30 years of his life the decedent generally was engaged in the handling of matters relating to estates and trusts, receiverships and corporate affairs. Business and professional circles in Philadelphia had a high regard for decedent's ability as counsel for receivers. About 1926 or 1927 E. L. Austin *122 was appointed one of the receivers of the Philadelphia Sesqui-Centennial Exposition. This receivership continued until about 1929 or 1930 when it was concluded upon payment of creditors. The decedent was counsel for Austin in that receivership. During the period that followed and to 1939 the decedent was counsel for Austin, as receiver, in approximately ten receiverships. Fees received by decedent as counsel for Austin as receiver in the various receiverships totaled more than $50,000. On September 11, 1929, Austin was appointed receiver of Nixon & Co., Inc. (stock brokers), sometimes hereinafter referred to as Nixon, and on October 14, 1930, was appointed receiver of Smith Brothers & Company (stock brokers), sometimes hereinafter referred to as Smith. Both appointments were made by the United States District Court for the Eastern District of Pennsylvania and in each instance Austin engaged decedent as his counsel. Austin maintained his office in a building different from that in which decedent had his office. The Nixon and Smith receivership proceedings progressed to the point where the court had allowed claims and ordered distributions of the funds of the receiverships to creditors. *123 In June 1939 distributions ordered by the court to certain of the creditors had not been made and these creditors had instituted proceedings against Austin to compel him to make distributions to them as ordered by the court. In that situation the decedent on June 29, 1939, held a conference in his office with H. E. Potter and Philip C. Herr about Austin's failure to make the distributions ordered by court and the resulting proceedings that had been brought against him. Potter had been an office associate of decedent since about 1923 and had assisted the decedent in numerous cases including the Nixon and Smith receiverships. In addition to being an attorney, Herr was a certified public accountant. Herr also had been associated with decedent during 1930 and 1931 and from about 1932 to 1936 had been in charge of criminal prosecutions by the State of Pennsylvania in connection with closed banks. During the conference Austin joined them and remained for about two and one-half hours. Austin, after considerable questioning by the decedent, Potter and Herr as to why the distributions had not been made as ordered by the court, told them that he did not have any money in the accounts of the *124 receiverships with which to make distributions totaling approximately $28,000 which the court had ordered distributed to creditors. Decedent, Potter and Herr attempted to find out from Austin what he had done with the moneys of the receiverships but they were unable to ascertain from him what disposition he had made of them. After Austin left, the decedent, Potter and Herr continued the conference and finally concluded that funds would have to be raised by decedent to pay off the creditors in the two receiverships in order to protect his (decedent's) professional reputation. The conference ended by the participants agreeing to attempt to devise ways for getting together approximately $28,000. The decedent accepted Austin's statement that the Smith and Nixon receiverships had no funds with which to make the distributions in question and did not have an audit or other investigation made of Austin's books or accounts as receiver. Nor, so far as shown, was the matter of Austin's shortages disclosed to the court or judge which had appointed him as receiver in the two receivership proceedings or to the other judges or courts in the Philadelphia area. "Every effort was made to keep the matter *125 quiet" as it was thought that this would protect the decedent's professional reputation. Decedent went to Austin's brother to try to raise funds to meet Austin's shortages. In addition decedent went to Austin's brother-in-law in Atlantic City, New Jersey, for a like purpose. In neither instance was decedent's approach successful. Having concluded that Austin was without funds and without any source from which he could raise them, the decedent from July 1 through July 7, 1939, by borrowings on his personal credit, which he subsequently repaid and by obtaining advance payment of a legal fee, got together a total of $27,500. The decedent deposited the money in his bank account and used it for making advances to Austin or in paying it out for Austin's account in connection with the Nixon and Smith receivership proceedings. Decedent advanced to Austin, or paid for his account, in connection with the two receivership proceedings, the following amounts on the indicated dates: June 26, 1939
$ 300.00
July 6, 1939
2,010.00
July 7, 1939
1,500.00
July 20, 1939
160.00
July 21, 1939
1,812.94
August 3, 1939
19,368.65
August 8, 1939
2,700.00
Total
$27,851.59
The *126 $19,368.65 shown above as having been advanced to Austin or paid for his account on August 3, 1939, was disbursed by the decedent in the following manner: During the morning of August 3, 1939, decedent, his secretary, Potter and Austin checked the list of creditors of Nixon and the amounts that were due them and the total thereof was determined to be $19,368.65. Austin thereupon signed a book of checks in blank on an account designated "Nixon & Company, E. L. Austin, Receiver, Special Account." Decedent drew a check on his bank account payable to Cash in the amount of $19,368.65. The decedent's secretary, accompanied by Potter, took the check to decedent's bank, received the cash therefor and took it to another bank where it was deposited in the account designated "Nixon & Company, E. L. Austin, Receiver, Special Account." On the same day the decedent's secretary and an assistant entered the names of the creditors of Nixon with the amounts due them on the checks which Austin had signed in blank, and mailed the checks as thus prepared to the creditors whose names appeared thereon. The account designated "Nixon & Company, E. L. Austin, Receiver, Special Account" was a special account *127 and was not the regular account which Austin had maintained for the receivership. The foregoing procedure was employed by decedent in order to make certain that all the money deposited in the special account would be used to pay the creditors and none would be available for Austin to appropriate to himself. Austin individually signed notes payable to the decedent as follows: Date
Amount
June 26, 1939
$ 300.00
July 6, 1939
2,009.05
August 3, 1939
19,368.65
Total
$21,677.70
At the time of the above-mentioned transactions on August 3, 1939, Austin orally promised the decedent that he would repay the entire amount of all the advances to him and payments made for his account. During the period from about 1928 until the time the decedent made good Austin's shortages in the Nixon and Smith receiverships, Austin always dressed well, drove a nice automobile and lived in such a manner as to give the impression that he possessed substantial wealth. In 1939, and prior thereto, his principal source of income (the amount of which is not disclosed) was from handling receiverships and reorganizing corporations. After 1939 he was not appointed to any more receiverships. *128 Subsequent to 1939 he did some work at an undisclosed compensation for a syndicate in connection with the bringing out of an issue of stock. However, during the years 1940 to 1945 when the war was on, there was nothing being promoted in the way of stock or stock issues of a character which Austin was capable of handling. From about 1942 until 1945 or 1946, Austin was employed by the Federal Government as a renegotiator of contracts and subcontracts relating to the Air Corps at a salary which he represented as being $4,000 or $5,000 a year. During the time Austin was employed as a renegotiator he, Herr and decedent had three or four conferences. On these occasions Austin reaffirmed his promise to repay his obligations to decedent as soon as the war was over and as soon as he was able to obtain more lucrative employment. After leaving the Federal Government service in 1945 or 1946, Austin entered the employment of the Ediphone Company, Philadelphia, Pennsylvania, at an undisclosed compensation. In that employment Austin represented the company in the Newark, New jersey, area and his business activities in that capacity were in northern New Jersey and not around Philadelphia. Between *129 1939 and 1948 Potter saw Austin about five or six times a year and on some of these occasions Austin sought legal advice from Potter on personal matters. When Potter inquired of him as to what he was doing, he would reply that he had every intention of making some money in the near future with which he would be able to pay the decedent what he owed him. On November 14, 1947, Austin conferred with Potter and decedent in the latter's office. During the conference they discussed generally what Austin was then doing and his present prospects of making some money and Austin stated that he wanted to get into a position whereby he could make repayment to decedent of the loans. Austin died in Bergen County, New Jersey, on January 21, 1948, without having paid the decedent anything with respect to the above-mentioned sums totaling $27,851.59 advanced by decedent to him or paid by decedent for his account in June, July and August 1939. Investigations initiated by decedent revealed that Austin left no estate, "not even enough to bury him." Each year beginning with 1940 through 1947 decedent considered deducting as a bad debt in his income tax returns, which he was filing in the respective *130 years, the above-mentioned $27,851.59 and sought Herr's advice as to the matter. Each time Herr advised him that he thought nothing had transpired to cause the sums to be a bad debt. After Austin died in 1948 leaving no estate, Herr advised decedent that a deduction for a bad debt should be taken in his 1948 return on account of the amount in question. Three or four times between 1945 or 1946 and 1948 decedent requested Potter to see what he could "generally find out about" Austin's financial condition and Potter "generally inquired from his [Austin's] brother." Several times prior to 1948 when preparing his income tax returns decedent discussed with Potter the matter of taking a deduction for a bad debt of the above-mentioned amount of $27,851.59. Each time Potter advised him that he could see no change in the situation justifying a deduction in the particular year for which the income tax return was being prepared. The following is a statement of the total amounts received by decedent as fees from the practice of law during the indicated years and the portions thereof representing commissions received as a fiduciary and as fees received as counsel for fiduciaries: Commissions and
Year
Total received
fees received
1937
$30,539.99
$17,190.68
1938
27,192.50
15,971.21
1939
29,585.03
14,196.02
1940
23,873.15
12,080.18
1941
23,452.76
7,138.61
1942
30,617.75
11,417.51
1943
72,414.21
51,177.96
1944
45,846.10
23,204.77
1945
53,508.17
43,671.08
1946
65,514.20
35,020.89
1947
72,756.14
42,385.50
1948
87,250.60
39,086.69
*131 In 1939 the decedent was acting as a fiduciary in a number of estates and trusts, the total gross value of which exceeded $500,000. At various times during the period January 1, 1940 to April 15, 1954, the date of his death, decedent acted as fiduciary in a number of trusts and estates, the total gross value of which exceeded $4,700,000. In the joint income tax return for 1948 of decedent and his wife a deduction of $28,001.59 was taken for a bad debt. The foregoing amount was composed of the above-mentioned $27,851.59 advanced by decedent to Austin or paid by decedent for his account in 1939 and $150 advanced to him by decedent on August 17, 1942. In determining the deficiency involved herein, the respondent disallowed the deduction taken giving the following explanation therefor: "The claimed deduction for alleged bad debts in the amount of $28,001.59 is disallowed." Opinion The petitioners take the position that the advances made by decedent to Austin and the sums paid for his account in 1939 totaling $27,851.59 constituted loans made by decedent in the course of his business, the practice of law, that the indebtedness represented by such loans did not become worthless during *132 the years 1939 through 1947 but did become worthless in 1948 when Austin died leaving no estate, and that accordingly the deduction taken therefor in 1948 should be allowed. The respondent contends that if the $27,851.59 in question represented an indebtedness owing by Austin to decedent, such indebtedness was worthless when created and did not become worthless in 1948 solely by reason of the death of Austin in that year, and, further, that the advances and payments in question were not proximately related to the decedent's practice of law and, consequently, were not deductible as business bad debts. Unless an indebtedness had value when created or acquired, a bad debt deduction therefor is not allowable. Eckert v. Burnet, 283 U.S. 140; Fred A. Bihlmaier, 17 T.C. 620; Ray Crowder, 19 T.C. 329. The burden was on petitioners to establish that the advances made by petitioner to Austin and the sums paid for his account represented an indebtedness owing by Austin to decedent which had value at the time created or acquired. We think they have failed to discharge their burden. The United States District Court for the Eastern District of Pennsylvania *133 appointed Austin receiver for Nixon in 1929 and receiver for Smith in 1930. As receiver for these firms moneys of the firms came into Austin's hand which the court ordered him to distribute to creditors of the firms. He disregarded the court's orders and did not make the distributions. By June 1939 certain creditors had instituted proceedings to compel him to make distributions to them as ordered by the court. Decedent, as his attorney, along with Potter and Herr, had an extended conference with Austin to ascertain why the distributions amounting to upwards of $28,000 had not been made. After considerable effort on their part, Austin admitted that he no longer had any moneys that the court had ordered distributed. They then attempted to ascertain from him what disposition he had made of the moneys but to no avail. As set forth in United States Code Annotated, Title 18, § 186, the law respecting the action of receivers unlawfully retaining receivership moneys after demand has been made therefor or converting such moneys to their own use or to the use of another was as follows during the years 1929 through 1939: "Court officers appropriating money. Any United States marshal, clerk, *134 receiver, referee, trustee, or other officer of a United States court, or any deputy, assistant, or employee of any such marshal, clerk, receiver, referee, trustee, or other officer who shall, after demand by the party entitled thereto, unlawfully retain or who shall convert to his own use or to the use of another any moneys received for or on account of costs or advance deposits to cover fees, expenses, or costs, deposits for fees or expenses in bankruptcy cases, composition funds or money of bankrupt estates, fees in naturalization matters, or any other money whatever which has come into his hands by virtue of his official relation or by the fact of his official position or employment shall be deemed guilty of embezzlement and shall, where the offense is not otherwise punishable by some statute of the United States, be fined not more than double the value of the money thus retained or converted or imprisoned not more than ten years, or both; and it shall not be a defense in such case that the accused person had an interest, contingent or otherwise, in some part of such moneys or of the fund from which they were retained or converted." Whether Austin as receiver unlawfully retained *135 moneys after demand by parties entitled thereto or whether he converted moneys to his own use or to the use of another, it is unnecessary to decide, since it is obvious that as receiver he did not dispose of the moneys as directed by the court and consistently with his duty as an officer of the court. In this respect he was indifferent to his duty and faithless to his trust. In that situation and after unsuccesful efforts to obtain funds from Austin's relatives to meet Austin's shortages, the decedent concluded that Austin was without funds and without any source from which he could raise them. Thereupon decedent got together funds on his own account with which he voluntarily made good Austin's shortgges. That the decedent, in making good Austin's shortages, lacked confidence in Austin's integrity and conception of honest dealing is evidenced by the manner in which the decedent disbursed the $19,368.65 to creditors in the Nixon receivership on August 3, 1939. The procedure there employed was to make certain that the entire sum then being advanced by decedent would be paid to the creditors and that none of it would be available to Austin to appropriate to himself. The record is *136 silent as to the method employed by decedent in disbursing the remainder of the $27,851.59 in controversy. It may well be that as to such remainder the decedent also employed a procedure which would prevent Austin from appropriating any of that money to himself. Although Austin gave decedent his promissory note for the $19,368.65 disbursed by decedent on August 3, 1939, and also gave decedent two other notes, dated in June and July 1939, totaling $2,309.05, making notes in the amount of $21,677.70, the amount in controversy is $27,851.59 or more than $6,000 in excess of the total of the notes. No explanation appears of record for the decedent's failure to obtain from Austin a note or notes for the amount of such excess. Whatever may have been the reason for the decedent's failure in this respect, the evidence clearly shows that despite Austin's repeated declarations made over the years 1939 through 1947 to repay decedent, the decedent in each of the years 1940 through 1948 considered deducting the amount in controversy as a worthless debt in his income tax returns but did not do so pursuant to advice received from those he consulted about the matter. While the record definitely *137 indicates that Austin was without funds, and decedent was convinced that such was the situation when he was making good Austin's shortages, the petitioners contend that Austin had considerable business ability and potential earning capacity and that these coupled with Austin's promises to repay are sufficient to warrant the conclusion that the amount in question did not become worthless prior to Austin's death. The petitioners have submitted a considerable amount of testimony to the effect that Austin was a capable business man and receiver with a considerable amount of administrative ability and with great potential earning capacity. Except for some general statements to the effect that in years prior to 1939 Austin had received some lucrative fees as receiver, we know nothing as to Austin's earnings in 1939 or prior thereto other than that they were principally from fees received for acting as a receiver and for rendering services in connection with corporate reorganizations. The record is silent as to when the Nixon and Smith receiverships terminated, as to the fees Austin received therefrom, and as to when he received them. Likewise, except for Austin's representations as to his *138 compensation as a Government contract renegotiator during the years 1942 to 1945 or 1946, we are not informed as to his earnings after 1939. If Austin had been a competent businessman with considerable administrative ability and the potential earning capacity here claimed fo him, it would appear that at some time between 1939 and his death in 1948 his earnings would have been large enough to enable him to have made some payment, even a token payment, to the decedent, if not payment in full. In view of what has been said above and from a consideration of the record as a whole, it is our opinion that the indebtedness of Austin, becoming due to the decedent as a result of the decedent's making good the shortages of Austin, was worthless when created in 1939 and that the respondent did not err in disallowing a deduction therefor in 1948. Since deduction of the amount in controversy is claimed on the ground that it was a business bad debt, and we have held that it was not allowable as such in 1948 because of its worthlessness at the time of creation in 1939, it becomes unnecessary to determine whether the decedent's action in making good Austin's shortages under the circumstances presented *139 was proximately related to decedent's business of practicing law as petitioners contend. Decision will be entered for the respondent.